UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA                                            CRIMINAL ACTION

VERSUS                                                                              15-61-SDD-SCR

CODY MACK

### RULING

This matter is before the Court on the *Motion to Suppress*[1] filed by the Defendant, Cody Mack ("Defendant"). The United States ("the Government") has filed an *Opposition*[2] to this motion. The Court held an evidentiary hearing on this motion on September 21, 2015, took the matter under advisement, and allowed the parties to file post-hearing briefs.[3] The Court has considered the arguments of the parties, the testimony and evidence presented at the hearing, and the law as applied to the facts of this case. For the reasons set forth below, the Defendant's motion shall be granted in part and denied in part.

### I.    FACTUAL BACKGROUND[4]

The Defendant was indicted on April 22, 2015 for possession with intent to distribute heroin (Count 1), possession of a firearm by a convicted felon (Count 2), and possession of a firearm in furtherance of a drug trafficking crime (Count 3). The

---

[1] Rec. Doc. No. 18.
[2] Rec. Doc. No. 21.
[3] The Government declined to file a post-hearing brief; the Defendant submitted a post-hearing brief. Rec. Doc. No. 29.
[4] The factual background was derived from the parties' briefs.
29189

Defendant moves to suppress all evidence resulting from his arrest and the search of his hotel room on December 10, 2014.

Defendant contends the police were conducting surveillance of the Defendant in the parking lot of his hotel based on the unsupported tip of an anonymous source that the Defendant was selling narcotics out of the Microtel Hotel on Plaza Americana Drive in Baton Rouge, Louisiana. Defendant contends that, after two days, the officers failed to observe any criminal activity. On December 10, 2014, upon the Defendant's return to the hotel, the officers claimed that he failed to use a turn signal when turning into the rear parking lot of the hotel; thus, the officers activated their blue lights and sirens to conduct a traffic stop. Rather than stop, the officers contend the Defendant did not stop but sped up into the parking lot. Defendant points out that the police vehicles were unmarked and that no dash cameras captured this alleged illegal turn. Defendant further contends he was forcibly removed from his car and tazed. Subsequently, the Defendant allegedly consented to the search of his hotel room, where the officers discovered narcotics and firearms. Defendant now moves to suppress all of the seized evidence arguing that, under the "fruit of the poisonous tree" doctrine, all evidence derived from the illegal stop and seizure must be suppressed. Defendant, likewise, challenges the search of his hotel room based on involuntary consent.

The Government's version of events are slightly different. The Government claims that, in October of 2014, the BRPD narcotics detectives were investigating drug trafficking at the Creft and Son Grocery Store ("the store") in a Baton Rouge area known as "Zion City." Through multiple sources of information, the officers learned that drug dealers were using the store to conduct drug transactions; thus, a covert pole camera

was installed to assist detectives in their surveillance of the store and investigation of drug trafficking activities.  The Defendant was observed on the Creft and Son pole camera surveillance.  In December of 2014, the detectives allegedly learned through a source that the Defendant did not have a residence but lived in hotels.  The detectives monitored the Defendant for two days at the Microtel, in addition to viewing the Defendant's activities on pole camera footage at the store.

On December 10, 2014, as the Defendant traveled back to the hotel from the store, an officer observed Defendant turn into the parking lot without using a turn signal.  Although the officer activated his lights and siren to conduct a traffic stop, the officer claims the Defendant continued driving in the parking lot in a reckless manner to evade police.  The detectives contend that, not only did the Defendant continue not to comply, but that he nearly struck another detective's vehicle during his "flight."  Once Defendant's vehicle was stopped, the officers approached the Defendant and instructed him to put his hands in the air; the Defendant allegedly refused to comply with these demands.  The officers contend that the Defendant's right hand was concealed under his shirt leading them to believe the Defendant might be concealing a weapon, so they deployed a Taser to subdue him.

Despite being hit by the Taser, the officers claim that the Defendant continued to resist and ignore their instructions.  After being tazed a second time, the Defendant was ultimately handcuffed and read his *Miranda* rights.  Before they asked the Defendant any questions, the officers contend he volunteered that he had narcotics on his person.  The detectives retrieved a clear, plastic bag containing four plastic bags of methamphetamine and seven plastic bags of heroin that the Defendant had concealed

in his buttocks.[5] An officer asked the Defendant if he had more drugs in his hotel room; the Defendant allegedly responded in the affirmative and advised that he also had a firearm in his room. The officers conducted a search incident to arrest and also found $748 and a key card in the Defendant's pockets. The Defendant allegedly told the officers he was staying in Room 323 and gave the officers consent to search his room. The Defendant allegedly guided the officers to his room where they discovered various narcotics, two digital scales, $8,190.00, a cutting agent, the firearm charged in the *Indictment*, and ammunition. As the officers searched the room, the Defendant allegedly made several statements regarding the narcotics, firearm, his distribution of drugs, and his status as a convicted felon.

The Government opposes the motion to suppress, arguing that the traffic stop was lawful and that the Defendant consented to the search of his room.

## II.   LAW & ANALYSIS

### A.  Motion to Suppress

Generally, "[t]he proponent of a motion to suppress has the burden of proving, by a preponderance of the evidence, that the evidence obtained was in violation of the Fourth Amendment.[6] Conversely, at a suppression hearing, the Government must prove, by a preponderance of the evidence, that the challenged evidence was lawfully obtained.[7]

---

[5] *Transcript*, at p. 29.
[6] *United States v. Kelley,* 981 F.2d 1464, 1467 (5th Cir.1993) (quoting *United States v. Smith*, 978 F.2d 171, 176 (5th Cir.1992)).
[7] *United States v. Valenzuela*, 716 F.Supp.2d 494, 500 (S.D. Tex. 2007) (citing *United States v. Matlock*, 415 U.S. 164, 178 n. 14 (1974)).
29189

### B. Anonymous Tip Justified *Terry* Stop

Under *Terry v. Ohio*,[8] "police officers may stop and briefly detain an individual for investigative purposes if they have reasonable suspicion that criminal activity is afoot."[9] When, as here, the officers conducting the stop act without a warrant, the Government bears the burden of proving reasonable suspicion.[10]

The Fifth Circuit holds that "[r]easonable suspicion can be formed by a confidential informant's tip so long as the information is marked by 'indicia of reliability.'"[11] In *United States v. Martinez*,[12] the Fifth Circuit discussed a number of the factors applied in determining whether a tip provides reasonable suspicion, including: "the credibility and reliability of the informant, the specificity of the information contained in the tip or report, the extent to which the information in the tip or report can be verified by officers in the field, and whether the tip or report concerns active or recent activity, or has instead gone stale."[13] The Supreme Court has held that whether an informant's information creates probable cause is to be determined by the "totality of the circumstances."[14]

The Defendant contends that there was no basis for the officers to conduct surveillance on the Defendant because the alleged information from an anonymous source was unsupported. First, the Defendant contends that, for an anonymous tip to serve as the basis for probable cause for the issuance of a search warrant, the tip must

---

[8] 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
[9] *Goodson v. City of Corpus Christi,* 202 F.3d 730, 736 (5th Cir. 2000).
[10] *See United States v. Martinez*, 486 F.3d 855, 859–60 (5th Cir. 2007).
[11] *United States v. Powell*, 732 F.3d 361, 369-70 (5th Cir. 2013)(quoting *Adams v. Williams*, 407 U.S. 143, 147, (1972); *United States v. Zamora,* 661 F.3d 200, 207 (5th Cir. 2011)).
[12] 486 F.3d 855, 861 (5th Cir. 2007).
[13] *Id.*
[14] *Illinois v. Gates*, 462 U.S. 213 (1983).
29189

include a range of details. It cannot simply describe easily observed facts and conditions but must predict the suspect's future movements, which must then be corroborated by independent police investigation.[15]

The Defendant contends that there is insufficient evidence to determine the reliability of the anonymous source in this case. Even if the Government comes forward with such evidence, and that evidence includes the fact that the informant had engaged in transactions with the Defendant, then the Government is required to turn over the name of the informant, which has not happened. Moreover, the Defendant contends the officers' testimony revealed numerous inconsistencies such that their testimony should not be accepted by the Court.

The Government argues that, prior to the Defendant's traffic stop, the detectives had reasonable suspicion based on information received from multiple sources that was corroborated by an independent investigation beginning in October of 2014. The independent investigation included the review of the pole camera surveillance footage, physical surveillance, and additional intelligence gathering. By December of 2014, the Government contends the detectives had identified the Defendant as a drug dealer, confirmed the Defendant's vehicle information, observed his actions at the Microtel, and monitored his suspicious activities outside the store. Based on the detectives' personal observations, the information gained during the investigation, and their training and experience as narcotics officers, the Government contends the detectives had a reasonable belief considering the totality of the circumstances that the Defendant was engaged in drug trafficking prior to the stop on December 10, 2014.

---

[15] The Defendant cites *Alabama v. White*, 496 U.S. 325 (1990).
29189

The Supreme Court addressed the circumstances under which an anonymous tip can create reasonable suspicion in *Alabama v. White*.[16] In that case, police officers had received an anonymous phone call advising that a woman named Vanessa White would be leaving a specific apartment building at a particular time in a brown Plymouth station wagon with a broken right taillight.[17] The informant also stated that White would go to a particular motel with an ounce of cocaine inside a brown attaché case.[18] The police located White and observed all of the facts given by the informant, stopping White just short of the motel.[19] The Court held that, because the anonymous informant's information had been confirmed by White's actions, the officers had reasonable suspicion to justify the stop.[20]

However, in *Florida v. J.L.*,[21] the Supreme Court reached a different conclusion. In that case, an anonymous informant called the police and reported that a young black male would be standing at a particular bus stop wearing a plaid shirt and carrying a gun.[22] The Court held that reasonable suspicion "requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person."[23] The Court distinguished *J.L.* from *White* noting that in *J.L.*, the informant "provided no predictive information" to enhance the reliability of the assertion of illegality.[24]

In *Martinez*, the Fifth Circuit held that reasonable suspicion was not present where an anonymous tip lacked any information linking the defendant to criminal

---

[16] 496 U.S. 325 (1990).
[17] *Id.* at 327.
[18] *Id.*
[19] *Id.*
[20] *Id.* at 331.
[21] 529 U.S. 266 (2000).
[22] *Id.* at 268.
[23] *Id.* at 272.
[24] *Id.* at 271.

29189

activity.[25] In *Martinez*, the primary basis for the officer's reasonable suspicion was an informant's tip. In that case, law enforcement in Houston received a tip that a man named "Angel" might have been a witness to a quadruple homicide, might be in possession of the weapons used in the homicide, and might be planning to flee to Mexico with the weapons.[26] The informant also stated that Angel might be staying with his girlfriend and provided an address. On the basis of this information, the officers began conducting surveillance outside of this address.[27] The Fifth Circuit held that the officers lacked reasonable suspicion to make a stop because, at the time, the only *verified* information that the police had was that a man named Angel was in a specified residence, and notably absent was any verified information that criminal activity may be afoot.[28]

However, in *United States v. McKnight*,[29] the Fifth Circuit held that reasonable suspicion existed where an informant gave predictive information that enhanced the reliability of the informant's assertion of illegality. In *McKnight*, the informant stated that the defendant would be transporting illegal narcotics, identified the defendant by name and race, and gave detailed information about the vehicle he would be driving. The informant also provided predictive information regarding the defendant's activities that

---

[25] *Martinez*, 486 F.3d at 863.
[26] *Id.* at 860.
[27] *Id.*
[28] *Id.* at 861-62. ("[T]he government elected not to call a single witness who had any first-hand knowledge of the tip or the informant. They knew only that the police department had received information 'from another person' about a man named Angel. None of them testified, nor could they have, about the source of that information, the reliability of that source, or the specifics of what he or she said. Thus there is no evidence in the record suggesting any basis for finding the informant credible, such as, for example, whether or not the informant had any past dealings with the police.")
[29] 469 F. Appx 349 (5th Cir. 2012).

29189

day.[30] Because the informant furnished specific information, including an allegation that the defendant was engaged in illegal activity which was corroborated by the officers in the field, the court held that the anonymous tip created reasonable suspicion.[31]

Considering the evidence presented in this case, the Court finds that the anonymous tips and confidential information, which was corroborated by the subsequent investigation, provided sufficient reasonable suspicion to justify the *Terry* stop at its inception. The testimony by Officer Liberto establishes that the information provided by confidential informants and anonymous tips to the investigation hotline satisfies the *Martinez* factors and is similar to the tips provided in *White* and *McKnight*. Because of the nature of the ongoing investigation which led to the Defendant's arrest, this case does not involve one informant with a tip or information for one specific event. Furthermore, the information obtained by officers was far more than simple identifying information. Officer Liberto testified that the investigation of drug trafficking in and near this store began in October and that he received information from several confidential informants who had proven to be reliable based on information provided in the past.[32] He also testified that he and his partner, Detective McCloskey, regularly corroborated hotline tips with confidential informants and *vice versa*.[33] Through the anonymous information provided, the officers became aware of Cody Mack's identity, his aliases of "Crucial" and "Montana," and that he was alleged to be selling heroin from the store.[34]

---

[30] *Id.* at 355.
[31] *Id.*
[32] *Transcript*, p. 10, lines 12-16: "Confidential informants that have worked for myself and my partner, Detective McCloskey, in the past that has given us information that led to either seizures of narcotics or firearms and felony arrests, and they have become pretty reliable."
[33] *Id.* at p. 10, lines 19-25.
[34] *Id.* at p. 13.
29189

The pole camera video allowed the officers to match the Defendant's 1984 black Chevy pickup truck to the owner's registration, thus corroborating the Defendant's name and date of birth.[35] The officers' surveillance of the Defendant established that he lived in hotels rather than a residence, and he would often park down the street from the store and walk to the store to allegedly sell heroin.[36] The Court acknowledges that there were inconsistencies between the two officers' testimonies; however, given that the confidential source information and hotline tips were overwhelmingly confirmed by the observance of the Defendant's actions, the Court finds that reasonable suspicion was established by a preponderance of the evidence.

Based on this evidence, the Court finds that the confidential informants had been shown to be credible and reliable based on past information; the information contained sufficient specificity such as Defendant's name, aliases, make and model of truck, and the allegation that the Defendant sold drugs in or at the identified store and provided predictive information of the Defendant's activities; the information was verified by the officers' own observations and the pole camera video obtained from the investigation; and the information concerned ongoing and recent activity. Thus, whether or not the Defendant failed to signal turning into the parking lot, the officers had an independent source of probable cause to stop the Defendant irrespective of the alleged traffic violation.

The Court also finds that the stop was reasonably related in scope to the circumstances that justified the stop in the first place. The basis for the stop was established from anonymous source tips and information gathered from the ongoing

---

[35] *Id.* at p. 13; 15-16.
[36] *Id.* at p. 15.
29189

investigation. Officer Liberto testified that, on the day of the arrest, the officers intended to stop the Defendant and have a conversation with him. The Defendant's alleged failure to use his turn signal was just another justification for the stop. Officer Liberto testified that he observed the Defendant's vehicle approach the hotel, and he observed the Defendant fail to use his right turn signal as he turned into the parking lot. Liberto immediately activated his lights and siren. Defendant allegedly failed to pull the vehicle over, sped up, and fled to the side of the hotel. Defendant's vehicle came to a stop in an open field on the east side of the hotel.[37] Thus, based on the officer's reasonable suspicion, the officers attempted to conduct a stop of the Defendant by merely pulling his car over. This clearly falls within the scope of the stop and is reasonably related in scope to the circumstances supporting the reasonable suspicion that justified the stop in the first place.

### C. Independent Basis for Probable Cause

While the Government maintains the legality of the stop, the Government contends that the Defendant's initial refusal to stop and attempted flight provided an independent basis for his arrest, attenuating any possible taint from any alleged prior misconduct. The Government cites *United States v. Nooks*,[38] where the Fifth Circuit held that a defendant's illegal flight broke the nexus between the illegal arrest and the search subsequent to apprehension.

> Specifically, the Fifth Circuit has held:
>
> "A person who is stopped or detained illegally is not immunized from prosecution for crimes committed during his detention period." *United States v. Garcia–Jordan*, 860 F.2d 159, 160 (5th Cir.1988). Even when a

---

[37] *Id.* at pp. 15-16.
[38] 446 F.2d 1283, 1288 (5th Cir. 1971).
29189

defendant has been subjected to an illegal arrest, seized evidence is admissible if its seizure was sufficiently attenuated that any taint attributable to the illegal arrest was eliminated. *See Wong Sun v. United States*, 371 U.S. 471, 487, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Independent probable cause that develops after an illegal arrest is "a critical factor attenuating the taint of the initial illegal arrest." *United States v. Cherry*, 794 F.2d 201, 206 (5th Cir. 1986).[39]

Considering the totality of the circumstances, the Government contends the *Terry* stop was justified; however, even if the Court found the initial stop to be unlawful, the Defendant's flight broke the nexus between any illegal stop and justified his subsequent arrest.

Following Fifth Circuit precedent, the Court agrees. The Fifth Circuit holds: "To warrant suppression ... challenged evidence must have been obtained 'by exploitation of [the alleged] illegality' rather than 'by means sufficiently distinguishable to be purged of the primary taint.'"[40] Thus, "[i]ndependent probable cause that develops after an illegal stop is 'a critical factor attenuating the taint of the initial illegal arrest.'"[41]

The Court finds that the Defendant's flight was a break in the chain of events sufficient to break any nexus between an illegal stop and the Defendant's subsequent arrest. Flight alone is enough to justify a police stop.[42] The evidence in this case reveals that Officer Liberto attempted to pull over the Defendant, but the Defendant failed to pull the vehicle over, sped up, and fled to the side of the hotel. Defendant's vehicle came to a stop in an open field on the east side of the hotel.[43] Officer Liberto

---

[39] *United States v. Puluc-Garcia*, 447 F. Appx 567 (5th Cir. Oct. 26, 2011).
[40] *United States v. Ibarra–Sanchez*, 199 F.3d 753, 761 (5th Cir.1999) (quoting *Wong Sun v. United States*, 371 U.S. 471 (1963)); *see also Nardone v. United States*, 308 U.S. 338, 341 (1939).
[41] *U.S. v. Montez-Sanchez*, 535 F. Appx 440, 442 (5th Cir. 2013)(quoting *United States v. Cherry*, 794 F.2d 201, 206 (5th Cir.1986).
[42] *Michigan v. Chesternut*, 486 U.S. 567 (1988).
[43] *Transcript*, pp. 24-25.

29189

stated that, after the attempted flight, the Defendant did not initially obey police orders to get out of the car.  For this reason, the Defendant was tased, pulled out of his truck, placed on the ground, tased again for resisting, and ultimately handcuffed.[44]  Because the Defendant's flight was a break in the chain of events, even if the initial stop was illegal, Defendant's actions render the "Fruit of the Poisonous Tree Doctrine" defense in applicable.[45]  The *Motion to Suppress*[46] any evidence obtained incident to Defendant's stop and arrest is therefore DENIED.

### D.  Voluntariness of Consent to Search

The Defendant also moves to suppress any evidence obtained from the search of his hotel room on the grounds that any alleged consent given by Defendant for the officers' search was not voluntary because it was the product of an illegal detention.  The Defendant claims that his custodial status coupled with clearly coercive police procedures demonstrate that his consent was not voluntary.  Citing the Fifth Circuit, the Defendant contends that consent is invalid when given during an illegal detention.[47]  However, the Defendant concedes that, in some cases, consent to search may dissipate the taint of a Fourth Amendment violation.  To make this determination, the Fifth Circuit instructs that the court must consider these three factors:  (1) temporal proximity of the illegal conduct and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the initial conduct.[48]  The Defendant contends that all three factors support a finding that his consent was invalid.

---

[44] *Id.* at p. 26.
[45] See *Illinois v. Wardlow*, 528 U.S. 119 (2000).
[46] Rec. Doc. 18.
[47] *United States v. Kye Soo Lee*, 898 F.2d 1034 (5th Cir. 1990).
[48] See *United States v. Jaquez*, 421 F.3d 338 (5th Cir. 2005).
29189

The Government acknowledges that Defendant was in custody at the time of the consensual search and acknowledges that the detectives had their weapons drawn and had used a Taser during the arrest; however, the Government contends that this initial show of force does not render the Defendant's consent invalid, and there were no physical or verbal threats (or any other coercive tactics) utilized to obtain the Defendant's consent.  The Government notes that the Defendant became cooperative once taken into custody and volunteered the information after he was advised of his rights.  The Government also contends the Defendant engaged the officers in a conversation about his conduct and continued to speak freely with them during the search.  The Government acknowledges that the officers did not specifically advise the Defendant that he had a right to refuse consent; however, the Government notes that the law does not require such an instruction,[49] and *Miranda* was appropriately given. The Government contends there is no evidence that the Defendant lacked sufficient education or intellect to understand the impact of his consent and, finally, the Defendant knew where the evidence would be found and told the detectives exactly where to find it.

"Consensual searches ... serve as an exception to the warrant requirement so long as the consent is free and voluntary."[50]  "The government's ability to rely upon the consent exception depends on two factors.  First, the government must show that the consent was given voluntarily ... Second, the prosecution must show that either the defendant himself consented to the search or that consent was obtained from a third

---

[49] *See United States v. Gonzales*, 79 F.3d 413, 421 (5th Cir. 1996).
[50] *U.S. v. Fernandes*, 285 Fed. Appx. 119, 126 (5th Cir. 2008) (citing *U.S. v. Mata*, 517 F.3d 279, 290 (5th Cir. 2008)).

29189

party that had the ability to furnish valid consent."[51] Consent-to-search voluntariness is determined by a six-factor, totality-of-the-circumstances analysis. The factors are: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.[52] "No one of the six factors is dispositive or controlling of the voluntariness issue."[53] The government has the burden of proving by a preponderance of the evidence that consent was freely and voluntarily given.[54]

In analyzing the factors to determine voluntariness, the Court finds that the first factor weighs in favor of the Defendant. It is clear that his alleged consent was given after the Defendant had been tazed twice, forced to the ground, and handcuffed. Further, it cannot seriously be argued that deploying a Taser on the Defendant not once, but twice, within several seconds is not coercive.[55]

The extent and level of cooperation with the police is a more challenging factor in this case. It is abundantly clear that the Defendant did not initially intend to cooperate with police as he attempted to flee and resisted arrest; however, the testimony of the officers is that, once subdued, the Defendant fully complied with the officers, initiated conversation regarding his actions, led them to his hotel room, and in fact directed the

---

[51] *U.S. v. Jenkins*, 46 F.3d 447, 451 (5th Cir.1995) (citing *Bumper v. North Carolina*, 391 U.S. 543 (1968); *U.S. v. Matlock*, 415 U.S. 164 (1974)); *see Morales v. Boyd*, 304 Fed. Appx. 315, 318–19 (5th Cir. 2008) (citing *Jenkins*).
[52] *Fernandes*, 285 Fed. Appx. at 126 (citing *Mata*, 517 F.3d at 290).
[53] *U.S. v. Ponce*, 8 F.3d 989, 997 (5th Cir.1993).
[54] *Id.*
[55] This is not to suggest that the officers coerced the Defendant into giving consent; rather, the Court finds that the force used by the officers in this case coerced the Defendant's compliance with their orders.
29189

officers to the contraband located around the room. The Court finds that this factor weighs slightly in favor of finding valid consent.

With respect to the Defendant's awareness of his right to refuse to consent, the Court is unconvinced, as discussed at the hearing, that the Defendant's prior criminal history demonstrates an awareness that he could refuse the officers' search. The officers readily admitted that, although they had given the Defendant his *Miranda* warnings, at no time did they advise the Defendant that he had the right to refuse to consent.[56] Furthermore, Officer Liberto testified that he told the Defendant that they were going to search his room and that they would get a warrant if he did not comply.[57] While this exchange was not improper, it does not establish by a preponderance of the evidence that the Defendant understood that he could refuse to consent. In fact, it could reasonably be interpreted as advising the Defendant that he ultimately had no choice in the search. This factor weighs against a finding of consent.

There is no evidence before the Court to suggest that the Defendant's education and intelligence level are less than average, and the Court finds this factor to be neutral.

The sixth factor weighs in favor of finding voluntary consent as the Defendant clearly knew that incriminating evidence would be found in his hotel room. Further, he allegedly directed the officers to the locations of contraband around the room.

Weighing all of the six factors, and considering the totality of the circumstances, the Court finds that the Defendant's consent was not voluntarily given to the search of his room. The circumstances surrounding the Defendant's arrest suggest to the Court that the Defendant's alleged consent was influenced by the fact that he had been tazed

---

[56] *Transcript*, p. 33.
[57] *Transcript*, p. 30.
29189

twice along with the officers' statements that they would be searching his room whether he granted consent or not. Officer Liberto admitted that officers have a written consent form that is used on such occasions, but he did not use it in this arrest because he "felt like I didn't need it. His consent was pretty forthcoming in my opinion."[58] The Court is unpersuaded that the Defendant's alleged consent was so "forthcoming" considering the totality of the circumstances of his arrest. Accordingly, the evidence obtained from the Defendant's hotel room was obtained without a warrant or legally valid consent and shall be suppressed.

### III.   CONCLUSION

For the reasons set forth above, the Defendant's *Motion to Suppress*[59] is GRANTED in part and DENIED in part. All evidence seized as a result of the search of Defendant's hotel room, for which valid consent was not obtained, is suppressed. The evidence seized and obtained incident to the Defendant's arrest is not suppressed.

**IT IS SO ORDERED.**

Signed in Baton Rouge, Louisiana on <u>November 10, 2015</u>.

                        */s/ Shelly D. Dick*

**JUDGE SHELLY D. DICK
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA**

---

[58] *Id.* at p. 34.
[59] Rec. Doc. No. 18.
29189